# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARC A. RODRIGUEZ,** | ) | **CASE NO.  1:24 CV 00735** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF GALION, et al.,** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **Defendants.** | ) | |

This matter is now before the Court on *Defendants' City of Galion and Thomas O'Leary's Joint Motion for Summary Judgment* (ECF #21), filed on March 31, 2025.  Plaintiff Marc A. Rodriguez filed his *Response in Opposition to Defendants' Motion for Summary Judgment* (ECF #23) on April 28, 2025.  Defendants filed their *Reply in Support of their Joint Motion for Summary Judgment* (ECF #25) on May 16, 2025.  The motion is now fully briefed and ready for ruling.

For the reasons stated below, *Defendants' City of Galion and Thomas O'Leary's Joint Motion for Summary Judgment* (ECF #21) is GRANTED in its entirety, and judgment is entered for Defendants City of Galion, Ohio and Thomas M. O'Leary.

# I.  <u>FACTS AND PROCEDURAL HISTORY</u>[1]

Plaintiff Marc A. Rodriguez is the former Chief of Police of the City of Galion, Ohio. (ECF #1, *Complaint With Jury Demand*, ¶¶ 1(2) & 6).[2]  Defendant City of Galion is Mr. Rodriguez's former employer, (ECF #1, ¶¶ 7-8).  Defendant Thomas M. O'Leary is, and was at all times pertinent to the allegations of the *Complaint*, Mayor of the City of Galion, (ECF #1, ¶ 5).

Mr. Rodriguez was terminated from his position as Chief of Police by Defendant City of Galion on December 22, 2022, for a number of violations of the City's "Failure of Good Behavior" provision of the *City of Galion, Ohio Personnel Policy Manual*, which prohibits "engaging in conduct giving insult or offense on the basis of race, color, sex, age, religion, national origin or disability."  (ECF #1, ¶ 1(5) & ECF #18-7, *Second Order of Removal*,[3] attached

---

[1]     The factual summary is based on the parties' statements of fact.  Any potentially material facts that are controverted and supported by deposition testimony, affidavits, or other evidence are reviewed and presented in the light most favorable to the non-moving party.  *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2]     Paragraph 1 of the *Complaint With Jury Demand* (ECF #1) is actually comprised of five paragraphs.  In order to maintain the otherwise numbering of the document, and for ease of reference, when reference is made to the allegations made in the "first paragraph," the individual portion of "¶ 1" is cited as "¶ 1(1)," "¶ 1(2)," "¶ 1(3)," "¶ 1(4)," or ¶ 1(5)."

[3]     The *Second Order of Removal*, dated December 22, 2022, was preceded by a *First Order of Removal*, dated December 16, 2022 (ECF #18-6, attached as an Exhibit to the Deposition of Marc A. Rodriguez, PageID #310-#313).  The two *Orders of Removal* are identical in text, with the only differences (besides the date of issuance), being that the *Second Order of Removal* adds Mayor Thomas M. O'Leary as a signatory for the City and adds a reference to Mr. Rodriguez's legal counsel in the closing paragraph describing the procedure for instituting an appeal.

as an Exhibit to the Deposition of Marc A. Rodriguez, PageID #310-#313).[4]

Mr. Rodriguez asserts that the City terminated his employment because of his Mexican heritage. (ECF #1, ¶ 1(4)). On April 23, 2024, Mr. Rodriguez filed a *Complaint With Jury Demand* in this Court (ECF #1) asserting federal claims against the City and Mayor O'Leary alleging violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*.), the Fourteenth Amendment to the U.S. Constitution, and Sections 1981 and 1983 of Title 42 of the United States Code. In addition, he asserted a state law claim against the City for alleged violation of Section 4112.02(A) of the Ohio Revised Code, and state law claims against Mayor O'Leary for alleged violations of Ohio Revised Code Section 4112.02(J) (aiding and abetting unlawful discriminatory acts) and Ohio Revised Code Section 2021.45 (knowingly depriving, conspiring, or attempting to deprive a person of a constitutional or statutory right by an Ohio public servant).

The basis for Mr. Rodriguez's allegations against the City and Mayor O'Leary are his

---

[4]

In his *Complaint*, and in his briefing on the summary judgment motion, Mr. Rodriguez spends much of his time arguing that the incidents for which he was terminated do not arise to a level of "sexual harassment" necessary to be found liable for a charge of sexual harassment under, say, Title VII or other provision of state or federal law. *See, e.g.*, ECF #1, *Complaint*, ¶ 1(2) ("Although the . . . allegations were subsequently described as sexual harassment, they were not"); ¶ 20 ("[T]he allegations against Chief Rodriguez . . . , none of which was substantiated as sexual harassment") & ECF #23, *Response in Opposition to Defendants' Motion for Summary Judgment*, p.11 [PageID #760] ("The City had access to experienced legal counsel who could have easily advised them that the manner and nature of [the] complaints [against him] was not going to lead to a valid case against Rodriguez or the City"). This is beside the point at issue, which is whether he was terminated for reasons for which he could be legitimately terminated – even if those reasons may not constitute "sexual harassment" as defined under a state or federal statute. The City's *Policy and Procedures Manual* lists "Group III" offenses, for which a first offense may result in "Termination of Employment," as including not only "an act of discrimination [or] sexual harassment." but also "engaging in conduct giving insult or offense on the basis of" various protected class characteristics. (ECF #18-10, *Policy and Procedures Manual*, PageID #338).

-3-

identification of a history of a contentious interactions with Mayor O'Leary during his time as Chief of Police, and two affidavits from former Galion officials who identified alleged past, years-earlier, potentially racially-animated comments made by Mayor O'Leary that were unconnected to Mr. Rodriguez or his termination.[5]

The Court, mindful of its obligation to evaluate the evidence "in the light most favorable to the party opposing the motion" for summary judgment, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), finds that the evidence presented established the following facts.

### *Alleged History of Contentious Interactions Between Rodriguez and O'Leary*

As to the history of contentious interactions between Plaintiff and Mayor O'Leary, Mr. Rodriguez points to his general description of Mayor O'Leary as "micromanaging" and "very aggressive at times." (ECF #18, *Deposition of Marc A. Rodriguez*, p.26 [PageID #96]). He identifies a number of specific incidents of contentious interactions between him and the mayor while he was Chief of Police.

At his deposition, Mr. Rodriguez recalled a time that Mayor O'Leary was displeased with him and "raised his voice" over how he relied on the Fire Chief's assistance to prepare the Police Department's budget:

> **Q:    OK. So, what were the context in which you and the mayor would have these meetings that you describe as contentious?**

---

[5]

    *See* ECF #18-14, *Affidavit of Paula E. Durbin*, attached as an Exhibit to the Deposition of Marc A. Rodriguez & ECF #18-15, *Affidavit of Rodney D. Sparks*, (same).  These affidavits also appear in the record as ECF #19-4 (*Durbin*) and ECF #19-5 (*Sparks*), attached as Exhibits to the Deposition of Thomas O'Leary.  These documents are discussed in detail later in this *Memorandum of Opinion*, with record citation to their appearance as exhibits attached to ECF #18.

A:      One that I can think of specifically was the – the budget.

**Q:      What do you recall from that meeting?**

A:      I had to, I guess, explain to him or go over the budget.  And I had asked
        numerous times for assistance with the budget from the safety service
        director.  And she had told me she would get with me and we would go
        over it, and that never happened.  And then towards the end, she told me
        to talk with the fire chief, which was Phil Jackson at the time.  And I
        think I reached out to him, but he wasn't available, from what I
        remember.  And she had asked me about it again, and then I had to meet
        with the mayor.  She said – I think she said you're meeting with him
        tomorrow, if I'm not mistaken.  And what I was trying to explain to him,
        I never had any experience with a budget.  I never had any training.  I
        didn't get the assistance when I asked – had asked for it, I had to present
        it to him and I was just trying to explain to him so he would understand
        why I didn't necessarily understand everything about it.  I told him I
        didn't prepare the budget, that the fire chief did.  And he raised his voice
        and – and said that I don't get to blame the fire chief.  And I told him,
        "I'm not trying to blame him.  I was just trying to let you know that I
        didn't know what I was doing with it and he assisted with it."

(ECF #18, *Deposition of Marc A. Rodriguez*, pp.28-29 [PageID #98-#99]).  Mr. Rodriguez later

admitted that he doesn't recall anything more about the budget being discussed between them,

and that the proposed budget was eventually approved.  (ECF #18, p.28 [PageID #99]).

Mr. Rodriguez recalled another time when Mayor O'Leary "raised his voice and pretty

much clenched his fist . . . and said, 'You're going to piss me off man,'" when he tried to get

approval for new decals for the Police Department cruisers.  (ECF #18, p.30 [PageID #100]).  Mr.

Rodriguez testified that he may have had one more meeting with the Mayor about the decals, and

that his proposal for new decals was accepted.  (ECF #18, pp.30-31 [PageID #100-#101]) ("I

believe it was in that meeting or it could have been a different one, but he made a comment that I

just do whatever I want to do. . . .  And ultimately, I ended up changing the graphics on the

cruiser.").

-5-

Also at his deposition, when asked if he could recall other specific interactions with the mayor evidencing "confrontation" while he was Chief of Police, Mr. Rodriguez conveyed a story about how a "fundraiser brick" that he purchased with his name on it was not installed by the City square gazebo, (ECF #18, p.32 [PageID #102]), though he later admitted he did not know whether the mayor had any role in making decisions about placement of the gazebo bricks, and conceded that this alleged incident "did not fit into [the] picture" of contentious interactions with the mayor.  (ECF #18, p.32 [PageID #102]).

Mr. Rodriguez also offered testimony about other "contentious interactions with the mayor" before he became Chief of Police, including one alleged incident when the prior Chief of Police purportedly told him that the mayor once made an unspecified racist comment or joke at some unidentified time.

Again mindful of the Court's obligation to evaluate the evidence "in the light most favorable to the party opposing the motion" for summary judgment, the Court considers Mr. Rodriguez's own words in describing this incident, presented here in their entirety, as related at Mr. Rodriguez's deposition:

> **Q:** **You also mentioned . . . that you might have had other contentious interactions with the mayor before you became chief.  Is that correct?**
>
> **A:** I – I felt I did, yes.
>
> **Q:** **Any specific recollections?**
>
> **A:** When one of the hotels opened in the city, the Sleep Inn, myself and John Borne were lieutenants at the time.  And Lieutenant Borne got to know the – the guy that was going to be the manager of the hotel.  He invited us to stop up sometime and told us that they were going to have a manager's reception event.  And I believe I stayed over that day.  I wasn't working, but I reminded Lieutenant Borne of that and thought it

would be a good idea to go up there to meet with him. I thought it would look good for, you know, the department to interact with some of the business people and I had questions about some of the security aspects of the facility, of how we would get in after hours through certain doors and different questions about their video surveillance system, stuff like that. And things were going fine. I mean, there was families here with their kids and we were talking with them. And I noticed that, obviously with the manager as your exception, there was some alcohol, you know, and they were drinking. So I thought it was probably better if we kind of got away from that area, just because of being in uniform, I think it would probably make some people feel uncomfortable. So we were talking with the manager and – and went down the hallway to a back stairwell. And I'd asked him about getting in after hours through a certain door. And I don't remember what else we were talking about. Lieutenant Borne had a friend of his that was riding with him that night. And I'd seen the mayor and obviously realized that he was looking at us or whatever, I think is another reason why I decided to go away from that area. And he ended up seeking us out and wanted to know why we were up there. So I told him we were invited and I had questions about, you know, different aspects of the hotel and stuff like that. And he was very – I don't know if condescending is the right word or not, but he was like, "Oh, all of a sudden you have questions now of all nights." And I could tell he was intoxicated. He'd been drinking. And he said his wife told him he shouldn't even come down there. And I said, "Well, Tom, I think she's right. I think you need to go." And he just gave a – a glaring look and then just kind of waived me off and dismissed me and then walked away. And I knew Lieutenant Borne's friend had posted something on the City's Facebook site about, "Wow, just met the mayor." And I don't remember exactly what he said but wasn't impressed with his behavior towards us and – and the way he was acting. And then I remember him – Lieutenant Borne saying something to the effect that that post was taken down. I don't know who took it down. I don't know why it was taken down but apparently it was.

**Q:**   **Okay.  So is Lieutenant Borne Caucasian?**

A:   Yes.

**Q:**   **So, if I can get an understanding, he – you interpret the mayor as kind of aggressively confronting you for being there?**

A:   Yeah.  The thing – when he was talking and things he was saying, he

was looking at me, directing it towards me is how I felt.

**Q:** **Okay.**

A: Yeah.

**Q:** **Okay.  Any other specific incidents with the mayor before you became chief?**

A: Back in – I don't remember the exact year.  It might have been 2014 or so.  Brian Sadderfield was the chief of police at the time.  And I remember – I think we were downstairs in the roll call room and he asked to talk to me in the lieutenant's office and was talking to me about a – a comment or joke and understood that I might have been offended by that.  And I just didn't acknowledge it because I felt my – part of my responsibility was to kind of insulate and protect the chief, so I didn't want to create any issues.  And I told him I didn't take offense to it, that I was just going to let go.

**Q:** **So the – I want to make sure I'm understanding.  Sadderfield  told you about a joke that the mayor had said?**

A: That he heard that I had taken offense to it.

**Q:** **Oh, that you had taken offense to a comment that the mayor had said?**

A: Uh-huh.

**Q:** **What was the comment?**

A: I – I don't recall.

**Q:** **Do you remember the context in which it was said?**

A: I don't.  I – I wasn't there for it.  Apparently, he'd said it around some other people.

**Q:** **Okay.  That's what I was going to ask, if you were firsthand – you didn't firsthand hear this comment, you just heard it from others?**

A: Correct.

**Q:** **Okay.  Anything else before you were chief?**

A:      Not that I can think of.

(ECF #18, pp.33-37 [PageID #103-#107]).

Mr. Rodriguez related another "contentious interaction" with the mayor while he was

Chief of Police, in which he appears to characterize the mayor as making a racist comment.

Again, in Mr. Rodriguez's own words:

> And I guess also as chief, when I was trying to procure some equipment, I
> know they had COVID funds available.  I was starting to realize that certain
> equipment was at end of life.  So, portable radios were one, the dispatch
> console was another one that were pretty major issues.  And at some point, I'd
> asked about using COVID funds to – to get new portable radios.  And he was
> upset about that.  I don't know if he – what he thought, but he made a
> comment, said, "What, every monkey needs its own banana?"  Actually, I
> might – I might be conflating that with another incident when I was trying to
> get newer vehicles for the detectives because they were breaking down a lot, at
> least one in particular was when the detective had to go up to Bowling Green,
> [Ohio] to take  evidence up to BCI [the Ohio Attorney General's Bureau of
> Criminal Investigation].  Couple times, I had to go pick him up.  And I think
> that's when he made that comment.  Might not have been about the radios.
> Might have been over getting newer vehicles for the detectives that were more
> reliable.

(ECF #18, pp.38-39 [PageID #108-#109]) (explanatory inserts supplied).

Finally, in support of his claims of "contentious interactions" with the mayor, Mr.

Rodriguez offered his belief that Mayor O'Leary often made "certain body signals," like

clenching his fists, or crouching forward, or saying things in an abrupt and aggressive manner"

toward Mr. Rodriguez that he did not believe were directed toward other City employees.  (*See*

ECF #1, ¶ 10 & ECF #18, pp.39-41 [PageID #109-#111]).

### *The Affidavits Claiming Past Discriminatory Comments by Mayor O'Leary*

Mr. Rodriguez also offers in support of his claim that his termination in December 2022

was the product of discrimination the affidavits of two former Galion employees stating that

-9-

Mayor O'Leary may have made general racist comments in 2014, and again in 2017 or 2018. None of the purported comments relate to Mr. Rodriguez specifically or his termination many years later.

The first affidavit is that of Paula Durbin, a former Treasurer and City Council member for the City of Galion, stating that Mayor O'Leary, in connection with a discussion at a meeting held in 2014 in the mayor's office among various City officials about copying and scanning public records, had said that he would get some "monkey scanners" to do the scanning, and that he later "proceeded to go off subject and went on a racist tirade about Mexicans." (ECF #18-14, *Affidavit of Paula E. Durbin*, p.1 [PageID #375]). Ms. Durbin also stated that "[o]ver the years, Mayor O'Leary has made multiple comments that evidenced a deep hatred of Blacks and Hispanics[,]" and that "Mayor O'Leary has not hired any Black employees and has not hired any Hispanic/Mexican employees during the roughly ten (10) years he has been in office." (ECF #18-14, p.1 [PageID #375]).[6]

As to the 2014 meeting in his office about copying public records, Mayor O'Leary recalled that the meeting occurred in 2014, but denied that he made racist statements at the meeting, (ECF #20-1, *Declaration of Thomas O'Leary*, ¶ 4 [PageID #504]) – though he did admit to using the term "scanner monkeys" during the meeting, as opposed to the term "monkey scanners" attributed to him in the affidavit. (*See* ECF #19, *Deposition of Thomas O'Leary*, p.50 [PageID #451]) ("I don't remember using that expression.  Actually, it's inverted.  It's scanner

---

[6]     While Mr. Rodriguez, a Hispanic/Mexican employee, was hired during this period, he states that "[a]lthough [I] was appointed by Defendant Mayor O'Leary, the mayor was bound by law to appoint [me] based on [my] examination results." (ECF #1, *Complaint*, ¶ 8) (inserts supplied).

-10-

monkeys. And it spoke to the use of temporary labor to take paper documents and turn them into electronic form.").

In her affidavit, Ms. Durbin also claimed that "The City of Galion does not celebrate Martin Luther King Day as a holiday, [a]nd . . . does not celebrate Cinco de Mayo and the Hispanic/Mexican heritage and culture in any manner either." (ECF #18-14, p.1 [PageID #375]). It is not stated when these claimed policies began or whether the mayor had any input in such decisions. Mr. Rodriguez further stated he does not know what was meant by Ms. Durbin's term "does not celebrate," while also noting his understanding that such things are generally governed by collective bargaining agreement. (ECF #18, *Deposition of Marc A. Rodriguez*, pp.148-49 [PageID #218-#219]). Thus, this portion of the affidavit does not appear to be evidence intended to be offered by Mr. Rodriguez in support of his claims.

The second affidavit is that of Rodney D. Sparks, another former Treasurer for the City of Galion. The full text of this affidavit (after stating his name and former title), was:

> When the City was working on the basketball courts project at Heise Park, I happened to be up at the City Building. I mentioned to Mayor O'Leary that the basketball project would be about $50,000. Mayor O'Leary then responded that he had a contract with Louie Cortez's company. I then said I know Louie and I am not here to take business away from Louie; and I like Louie.
>
> Mayor O'Leary then totally out of the blue and *loudly* yelled out "I hate all Mexicans!"

(ECF #18-15, *Affidavit of Rodney D. Sparks*, p.1 [PageID #377]) (emphasis in original).

As to this incident, Mayor O'Leary recalled the conversation with Mr. Sparks about the basketball courts project as having occurred in either 2017 or 2018, but denied saying "I hate all Mexicans." (ECF #20-1, *Declaration of Thomas O'Leary*, ¶¶ 7-8 [PageID #505]).

Beyond the remarks identified in these two affidavits, which Mr. Rodriguez stated he was

not aware of during his tenure with the City, and the earlier alleged incident in 2014 when then-Chief Sadderfield told him that Mayor O'Leary may have made a racist joke, Mr. Rodriguez said he was not aware of the mayor having made any other racially discriminatory comments.  (ECF #18, pp.144-45 [PageID #215-#215]).[7]

### *Mr. Rodriguez's Termination as Chief of Police*

In mid-August 2022, a female, twenty-year tenured, Police Department Dispatcher, Angela Scott, left a written letter with Galion Safety-Service Director Nicole Ward stating that she was "resigning, effective immediately," because she believed that she had "been disciplined more harshly than men in the department," and was "being treated worse than others because of my gender and because I turned down Chief Rodriguez's unwanted sexual advances."  (ECF #19-1, *Letter from Angela Scott*, attached to the Deposition of Thomas O'Leary, PageID #479).  In that letter, Ms. Scott alleged that Police Chief Rodriguez, "In May, at a wedding, . . . kept rubbing my leg and offering to give me a ride home," and then "in June [or] July, he followed me home," and "[t]hen, in the fall, he told me that he wanted to see 'boudoir pictures' of me."  She also alleged that Police Chief Rodriguez "sent me inappropriate texts after midnight on New Year's

---

[7]
      In their *Motion for Summary Judgment*, Defendants note that, at his deposition, Mr. Rodriguez also testified about hearing from a local Galion business owner that the business owner had once overheard a conversation between the Mayor and another City employee that contained unidentified allegedly racist statements, (*see* ECF #18, p.144 [PageID #214], "There's a gentleman in the city that owns some businesses who told me that the mayor was a racist, that he'd overheard a conversation that him and – and another member of the city was having, and that was off putting to him, and that they were talking about my situation"), but this event is uncorroborated beyond Mr. Rodriguez's generalized deposition statement, as well as inadmissible hearsay, which would not represent valid evidence to support or oppose a motion for summary judgment.  *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment").  Notably, Mr. Rodriguez makes no mention of this statement in his opposition to Defendants' motion, apparently evidencing no intention to rely on it.

Day." (ECF #19, PageID #479). The letter closed by stating "Chief Rodriguez has created an environment that makes it difficult for me to do my job. I have to face him every day after the sexual harassment, and it has been unbearable. I can't take the constant torment anymore, so I'm resigning, effective immediately." (ECF #19-1, PageID #479).

On receiving this letter, Safety-Service Director Ward took it to Mayor O'Leary. (ECF #19, *Deposition of Thomas O'Leary*, pp.9-10 [PageID #410-#411]). Mayor O'Leary testified that he "looked at" the letter, versus reading it, while Director Ward told him what was in it. (ECF #19, pp.9-10 [PageID #410-#411]. Aware that "[t]here had been an ongoing dispute with Angela Scott and the chief," the disciplinary action, and "the tension between those two coworkers." Mayor O'Leary determined that the matter needed to be referred to the City's human resources consulting firm, Clemans Nelson and Associates to conduct an investigation. (ECF #19, p.10 [PageID #411]). At the same time that the matter was referred, Mr. Rodriguez was placed on paid administrative leave. (ECF #19, p.18 [PageID #419]).

While the Clemans Nelson investigation was going on regarding Ms. Scott's allegations, a second woman, Galion's Clerk for the City Auditor, Eunice Collene, reported to Clemans Nelson that Mr. Rodriguez made "inappropriate remarks of a sexual nature and innuendo" toward Ms. Collene shortly after he became Police Chief. (ECF #18-5, *Pre-Disciplinary Conference Report by Clemans Nelson*, pp.12-15 [PageID #301-#304]) (listing the various comments alleged to have been made by Police Chief Rodriguez toward Ms. Collene).[8] Ms. Collene also reported to Clemans Nelson an uncomfortable interaction with Chief Rodriguez where he "indicated" that he

---

[8]    The *Pre-Disciplinary Conference Report by Clemans Nelson*, referred to throughout this *Memorandum of Opinion* as the Clemans Nelson report, or a variation thereof, also appears in the record as ECF #19-3. Reference throughout will be as it appears in ECF #18-5.

was "waiting for her" outside an Elk's Lodge, then "followed her in [his] work vehicle and subsequently called her and sent her a text message, asking about her whereabouts for an upcoming committee meeting."  (ECF #18-5, pp.12-13 [PageID #301-#302]).

During its investigation, which ran from August 17, 2022 to December 13, 2022, Clemans Nelson interviewed seven witnesses, though Ms. Scott was not among them, concluding with a report issued to Mayor O'Leary and Safety-Service Director Ward dated December 13, 2022.[9]

The Clemans Nelson investigation examined seven independent allegations of violations by Chief of Police Rodriguez of the City of Galion's *City Personnel Policy Manual* related to "Failure of Good Behavior" – four related to the allegations made by Ms. Scott, and three related to the allegations made by Ms. Collene; each alleged violation was described in the report as :

> **Failure of Good Behavior, violation of City and department Policy (City Personnel Policy Manual Section 8.05 [Group III, #10, "engaging in conduct giving insult or offense on the basis of race, color, sex, age, religion, national origin or disability" (failure of good behavior)]; Department General Order 26, Section 26.1.1 [Conduct Unbecoming]),** *conduct unbecoming an employee in the public service, offensive conduct toward fellow employees, superiors, or the public in the course of employment.*

(ECF #18-5, pp.5, 7, 8, 10, 13, 14 & 15 [PageID #294, #296, #297, #299, #302, #303 & #304).[10]

With respect to the claims of sexual harassment lodged by Ms. Scott, the Court notes that

---

[9]   The report indicates that "many attempts were made to contact Ms. Scott and [her] Attorney, . . . but ultimately she did not agree to be interviewed."  (ECF #18-5, p.4 [PageID #293]).

[10]   The text in plain type appears in the description of the definition of "Failure of Good Behavior" in connection with all seven charges.  The additional text, reproduced in italics here, appears in the definition included in the portion of the report concerning the investigation of the allegations made by Ms. Collene.

Mr. Rodriguez does not appear to contest the accuracy of the facts alleged by Ms. Scott or the substance of the comments attributed to him, but only the implication that these acts or comments had a sexual context, as is evident from the heading of one of the sections of Mr. Rodriguez's *Response in Opposition to Defendants' Motion for Summary Judgment*, titled "Rodriguez essentially admitted the factual substance of the claims made by Scott but squarely denied any sexual intent." (ECF #23, p.4 [PageID #753]).

As to six of the alleged violations, the report concluded "the charged misconduct occurred." (ECF #18-5, pp.7, 8, 9, 11, 14 & 16 [PageID #296, #297, #298, #300, #303, #305]).[11]

The evidence shows that a few days after Clemens Nelson gave the City its report, Director Ward briefed Mayor O'Leary as to its findings. (ECF #19, p.28 [PageID #429]). While Mayor O'Leary and Director Ward noted that Dispatcher Angela Scott had not followed the proper procedures in reporting alleged sexual harassment by doing so in her letter of resignation given to Director Ward, (ECF #19, pp.15-17 [PageID #416-#418]), they determined that the events described in the report were "a series of incidents that were not – becoming[,] not what one expected of a chief." (ECF #19, p.20 [PageID #421]). When asked why the City did not just sit down with Police Chief Rodriguez in an effort to address the behavior described by Ms. Scott, given that Ms. Scott had resigned and therefore would not be the subject of further alleged retaliation, Mayor O'Leary testified that "what moved the scale or shifted the balance" toward coming to the decision to terminate Police Chief Rodriguez was the series of additional

---

[11] One of the charges related to an ambiguous comment allegedly made by Mr. Rodriguez of "one less thing she had to worry about" following Ms. Collene's asking him "what his wife would think of the comments" that formed the basis of a finding of misconduct described in an earlier charge. On this, the report notes, "The charged misconduct as to the statement ('one less thing she [his wife] had to worry about') did not occur." (ECF #18-5, p.15 [PageID #304]).

allegations reported by Ms. Collene during the course of the investigation.  (ECF #19, p.43 [PageID #444]).  When asked why lesser discipline was not considered, such as a reprimand or a suspension, instead of termination, Mayor O'Leary responded that, "there was express concern that . . . the behavior would continue" and that "we'd have to deal with that with other female employees."  (ECF #19, p.33 [PageID #434]).

A few days after receiving the Clemans Nelson report, based on Pre-disciplinary conferences held on November 4, 2022, and Friday, December 9, 2022, but also based on the incorrect understanding that decisions to hire or fire employees within the Police Department were left to the Safety-Service Director, Director Ward made the initial decision to remove Mr. Rodriguez from his position as Chief of Police, as reflected in an "Order of Removal" dated December 16, 2022, and signed by Safety-Service Director Nicole Ward.  (ECF #18-6, *First Order of Removal*, PageID #307-#309).  Mayor O'Leary stated that he supported that decision. (ECF #19, p.6 [PageID #407]).

The December 16, 2022 Order of Removal directly incorporated the Clemans Nelson findings of violation of the "Failure of Good Behavior" provisions of the *City Personnel Policy Manual*, which were reflected in findings on seven "Counts" of violation, each preceded by a recitation of the "Failure of Good Behavior" provision's text:

> *In January of 2022, you sent an inappropriate text message to a subordinate employee, Angela Scott.  (Count 1);[12]*
>
> *In Fall of 2021, you requested that Ms. Scott show you personal photos of herself.  You responded in your investigatory interview that you did not know*

---

[12]    The "inappropriate text message" reference relates to a text sent by Mr. Rodriguez to Ms. Scott shortly after midnight on New Year's Day reading, "U twerkin?"  (ECF #18-5, p.10 [PageID #299]).

*the photos of Ms. Scott were personal/revealing photos when you requested them.  According to a witness, Olivia Cheney, upon your statement to Ms. Scott that you hadn't seen her pictures yet, Ms. Scott explained that the photos were not for work, and you indicated that you still needed to see the photos. (Count 2);*

*In the Summer of 2021 (June/July) you followed Ms. Scott to her residence in your vehicle.  During your investigatory interview you indicated that you encountered Ms. Scott in traffic and followed her vehicle to her new residence.  (Count 3);*

*In March of 2021, and during a wedding for another City of Galion employee, you were witnessed inappropriately touching Ms. Scott on the leg as she was shifting her body away from you.  (Count 4);*

*As communicated by witness, Eunice Collene, upon your promotion to Chief of Police, and while Ms. Collene was assisting you in learning a software program for your new position, you made an inappropriate remark of a sexual nature and innuendo by stating "while you are down there . . ."  During the second pre-disciplinary conference you responded, "I do not remember saying that.  No."  When asked for clarification on your response, you failed to answer, unequivocally, "No", that you did not make the alleged statement. (Count 5);*

*As communicated by witness, Ms. Collene, upon your promotion to Chief of Police, and while Ms. Collene was assisting you in learning a software program for your new position, you made an inappropriate remark of a sexual nature including words to the effect that you keep air conditioning on in your office because it makes women's nipples hard.  During the second pre-disciplinary conference you responded, "No.  I don't remember saying that either."  When asked for clarification on your response, you failed to answer, unequivocally, "No", that you did not make the alleged comment.  (Count 6);*

*As communicated by witness, Ms. Collene, she was leaving the Elk's Lodge. Ms. Collene got on her motorcycle to leave and you pulled up next to her, while in uniform and in your work vehicle.  You rolled down your window and indicated to Ms. Collene that you were waiting for her.  Ms. Collene proceeded to leave, and you followed her in your work vehicle and subsequently called her and sent her a text message, asking her whereabouts for an upcoming committee meeting.  (Count 7).*

(ECF #18-6, PageID #307-#309).

Shortly after issuance of the December 6, 2022 Order of Removal, Mayor O'Leary was

informed that state law required him to sign the paperwork effecting Police Chief Rodriguez's termination.  (ECF #19, pp.607 [PageID #407-#408]).  A second Order of Removal document was then issued, which was a verbatim copy of the first, except that the second Order of Removal was issued over the signatures of both Mayor O'Leary and Safety-Service Director Ward.  (ECF #18-7, *Second Order of Removal*, PageID #310-#314).[13]

After receiving the second "Order of Removal," Mr. Rodriguez appealed his termination to the City of Galion Civil Service Commission, which upheld his termination based on the City's proof by a preponderance of the evidence of the charges made in connection with the allegations made by Angela Scott (Counts 1, 2, 3, and 4 of the Order of Removal),[14] as reflected in the following findings:

Is Rodriguez's Termination Appropriate?

(1)    The City proved by the preponderance of the evidence, the existence of the policies cited in Counts 1-4 of the Order of Removal.

(2)    The City proved by a preponderance of the evidence that Rodriguez was aware of the policies listed in Counts 1-4 of the Order of Removal.

(3)    The City proved by a preponderance of the evidence that Rodriguez violated the policies outlined in Courts 1-4 of the Order of Removal.

---

[13]    The apparent discrepancy in length between the submitted three-page *First Order of Removal*, (ECF #18-6, PageID #307-#309), and the seemingly five-page *Second Order of Removal*, (ECF #18-7, PageID #310-#314), is that the second one, as filed with the Court, includes an essentially "blank" page 2 (PageID #311) and an essentially "blank" page 5 (PageID #314), which state only "Tab 13" and "Tab 14," respectively.

[14]    The Civil Service Commission, however, found that the City did not meet its burden of proof as to the charges made in connection with the allegations made by Eunice Collene (Counts 5, 6, and 7 of the Order of Removal).  (ECF #18-12, *Final Order of the Galion Civil Service Commission*, p.14 [PageID #371]).

(4)  The City had rules proscribing the conduct of Rodriguez; Rodriguez was aware of the rules; and Rodriguez engaged in conduct violating the rules.

(5)  Termination is the appropriate penalty for Rodriguez's failure of good behavior and unbecoming conduct.

\* \* \* \* \*

(15)  The City had "just cause" to terminate Rodriguez.

(16)  The termination of Rodriguez effective December 22, 2022 is affirmed.

(ECF #18-12, *Final Order of the Galion Civil Service Commission*, pp.14-15 [PageID #371-#372]) (citations to the City's hearing exhibits omitted).

The Court now turns to Mr. Rodriguez's claims that his termination as Chief of Police was not for the reasons stated, but rather as a pretext for anti-Hispanic/Mexican discrimination directed toward him by Mayor O'Leary and the City of Galion.

## II.  <u>LEGAL STANDARDS AND ANALYSIS</u>

### A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).

A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson*

-19-

*v. Liberty Lobby, Inc.*, 477 U.S. 232, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Although evidence may be presented in support of a summary judgment motion, the moving party need not support its motion with affidavits or similar materials that negate the non-movant's claims, but need only show that "there is an absence of evidence to support the non-moving party's case." *Morris v. Oldham Cty. Fiscal Court.*, 201 F.3d 784, 788 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323-25). The court will review the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

### B. **Plaintiff's Claims**

Plaintiff's *Complaint With Jury Demand* (ECF #1) listed both federal and state claims against the City of Galion and Mayor O'Leary. As against the City, he asserts federal claims for alleged violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*.), the Fourteenth Amendment to the U.S. Constitution, and Sections 1981 and 1983 of Title 42 of the United States Code, and a state law claim for alleged violation of Ohio Revised Code § 4112.02(A), which prohibits unlawful discriminatory practices. As against Mayor O'Leary, he asserts the same federal claims for alleged violation of Title VII, the Fourteenth Amendment, and Sections 1981 and 1983 of Title 42 of the United States Code, and state law claims against Mayor O'Leary for alleged violations of Ohio Revised Code Section 4112.02(J) (aiding and abetting unlawful discriminatory acts) and Ohio Revised Code Section 2021.45 (knowingly depriving,

-20-

conspiring, or attempting to deprive a person of a constitutional or statutory right by an Ohio public servant).

Defendants City of Galion and Mayor Thomas O'Leary filed their *Joint Motion for Summary Judgment* (ECF #21), addressing each of Plaintiff's claims and seeking summary judgment on each of them.  Plaintiff's *Response in Opposition to Defendants' Motion for Summary Judgment* (ECF #23) argues generally that "[a] reasonable jury could decide that Rodriguez meets the elements for race discrimination under Title VII," on which, evaluating the summary judgment pleadings "in the light most favorable to the party opposing the motion," the Court will take as addressing the Title VII claim as asserted against both the City and Mayor O'Leary.

Plaintiff's *Response* makes no mention of the federal claims asserted under 42 U.S.C. § 1981, or 42 U.S.C. § 1983 (the vehicle by which one brings a Fourteenth Amendment claim against a state entity), as against either the City or the mayor, nor does it address any of the state law claims asserted against the City (Ohio Rev. Code § 4112.02(A)) or the mayor (Ohio Rev. Code § 4112.02(J) and Ohio Rev. Code § 2021.45) at all.  Thus, "[t]he Court may consider this silence a tacit acknowledgment that Plaintiff[] [has] abandoned [these] claims." *Scanlon v. Unum Life Ins. Co. of Am. (In re Estate of Wallner)*, 221 F. Supp. 3d 967, 972 (N.D. Ohio 2016); *see also Rugiero v. Nationstar Mort.*, 580 Fed. App'x 376, 378 (6th Cir. 2014) (affirming summary judgment where plaintiff's response failed to address defendant's arguments); *Hicks v. Concorde Career Coll.*, 499 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in response to a motion for summary judgment); *Connor v. Hardee's Food Sys.*, 65 Fed. App'x 19, 24-25 (6th Cir. 2003)

(plaintiff's failure to brief a claim in the district court is an abandonment of the claim).[15]

The Court thus turns to examining Plaintiff's Title VII claims.

As a general matter, before even addressing the issue of whether Plaintiff even *pled* a claim of individual liability under Title VII against Mayor O'Leary,[16] to succeed on his claims, Mr.

---

[15]
    Even if Plaintiff could be said to have addressed his claims under 42 U.S.C. § 1981 or 42 U.S.C. § 1983 (Fourteenth Amendment) in his opposition briefing, because the Court finds that Defendants are entitled to summary judgment on his Title VII claim, they would be equally entitled to summary judgment on these claims as well.  *See, e.g.*, *Smith v. Chattanooga-Hamilton Cty. Hosp. Auth*, 829 F.2d 1126 (table), 1987 U.S. App. LEXIS 12826, at *9 (6th Cir. 1987) (unpublished) ("[I]f a plaintiff does not have enough evidence to succeed with a discrimination claim under Title VII, [then they] also cannot succeed under either § 1981 or § 1983.").  Under no reading of the Plaintiff's opposition brief could it be said to have addressed any of the state law claims.

[16]
    Except for a general statement in the opening paragraph of the *Complaint* that "[t]his is an action . . . arising from employment discrimination by the City of Galion, Ohio, as well as its Mayor, Thomas O'Leary, personally and in his official capacity, in violation of Title VII[,] . . . the Fourteenth Amendment[,] . . . Sections 1981 and 1983[,] . . . and Sections 4112(A) and (J), 2921.45, and 2307.60 of the Ohio Revised Code," (ECF #1, ¶ 1(1)), all of the specifically asserted federal law claims contained in the *Complaint* refer only to "Defendants" generally, (*see* ECF #1, ¶¶ 28-33), without any factual assertions stated within them as to why a City employee acting as a City employee, such as the mayor, may be held individually liable under the referenced federal laws.  The only specific individual liability claims against Mayor O'Leary were those asserted under Ohio Revised Code Sections 4112.02(J) and 2921.45 (as pled here, section 2307.60 is not an independent cause of action, but merely the "vehicle" statute through which one can seek damages in a civil action for the violation of a crime, such as Ohio Revised Code Section 2921.45).  As noted earlier, the "individual liability" state law claims against Mayor O'Leary have been abandoned (as well as the state law claim against the City under Ohio Revised Code Section 4112.02(A), in addition to the non-Title VII federal claims asserted against both Defendants).  Given that two of the statutes cited in this opening "umbrella paragraph," Ohio Revised Code Sections 4112.02(J) and 2021.45, are not statutes that would even *apply* to Defendants such as the City, taking the general opening paragraph as preserving an "individual liability" claim under Title VII as against Mayor O'Leary, absent any specific allegations supporting it in the substantive claim paragraphs of the *Complaint*, suggests an overindulgent application of the text of that sentence.  Nevertheless, once again evaluating the pleadings "in the light most favorable to the party opposing the motion," the Court will address "individual liability" claims under Title VII.

Rodriguez bears the overarching burden of establishing, through either direct or circumstantial evidence, that he was terminated from his employment because of his race. *See*, *e.g.*, *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 835 (6th Cir. 2012). If Mr. Rodriguez cannot point to any *direct* evidence that his discharge was due to his race, then his claims for employment discrimination can only survive if he can satisfy the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1983), to establish *circumstantial* evidence of discriminatory motive.

As stated most recently in *Kean v. Brinker Int'l Inc.*, No. 24-5514, slip op. at 18 (6th Cir. June 17, 2025), "under the *McDonnell Douglas* framework, '[f]irst, the plaintiff must produce "evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination" before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the averse employment action.' [*Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020)] (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). 'Then, the plaintiff must rebut the proffered reason by producing "evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination."' *Id.* (quoting *Blair*, 505 F.3d at 524)."

### 1. *Plaintiff's "Individual Liability" Claim Against Mayor O'Leary Under Title VII*

Plaintiff was an employee of the City of Galion, and of its Police Department specifically. Nowhere in his *Complaint* does he allege facts that would support a finding that he was "employed" by Mayor O'Leary personally or individually. "It is well settled in the Sixth Circuit that 'a supervisor who does not otherwise qualify as an employer cannot be held personally or

individually liable under Title VII.'"  *Hobbs v. Lucas Cty., Sheriff's Off.*, 537 F. Supp. 3d 962, 964-65 (S.D. Ohio 2021) (quoting *Little v. B.P. Expl. & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001)); *see also Wathen v. GE*, 115 F.3d 400, 405 (6th Cir. 1997) ("We now hold that an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII. . . .  Congress did not intend to provide for individual employee/supervisor liability under Title VII.") (rejecting an "agency" theory of individual liability under Title VII notwithstanding the general definition of "agent" as "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment.'").

Accordingly, Defendant Mayor O'Leary is entitled to summary judgment as to any claim of "individual liability" as a matter of law under Title VII, to the extent that such a claim could be said to have been included in the *Complaint*.

### 2.  *Plaintiff's "Official Capacity" Claim Against Mayor O'Leary Under Title VII*

Plaintiff's claim against Mayor O'Leary for alleged violation of Title VII in his "official capacity" fails as well.  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  "It is *not* a suit against the official personally, for the real party in interest is the entity."  *Id.* at 166 (emphasis in original).  The Sixth Circuit has routinely upheld the dismissal of governmental agents in their official capacity so long as the governmental agency is also sued.  *See*, *e.g.*, *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 328 (6th Cir. 2013); *Foster v. Michigan*, 573

-24-

F. App'x 377, 389-90 (6th Cir. 2016) ("Where the entity is a named defendant, an official-capacity claim is redundant.").

Accordingly, on this claim too, Defendant Mayor O'Leary is entitled to summary judgment as a matter of law under Title VII.

### 3.  *Plaintiff's Claim Against the City Under Title VII*

Title VII prohibits employers from "discharg[ing] any individual, or otherwise to discriminate against any individual with respect to his . . . privileges of employment . . . because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).[17]

### (a)  Direct Evidence

The Court first looks to whether Plaintiff Rodriguez has produced any *direct* evidence of discrimination on the basis of race in connection with his termination.  Direct evidence is evidence that, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir. 1999).  "Direct evidence does not require any inferences to conclude that an adverse employment action was motivated at least in part by race."  *McCormick v. Gasper*, No. 22-1033, 2022 U.S. App. LEXIS 30559, at *10 (6th Cir. Nov. 1, 2022).  Evidence may only serve as direct evidence of discrimination if it conclusively proves "not only discriminatory animus, but also that the employer actually acted on that animus."  *Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn*., 502 F. App'x 523, 534 (6th Cir. 2012) (citing *Amini v. Oberlin Coll*., 440 F.3d 350, 359 (6th Cir. 2006)).

---

[17]     Title VII of the Civil Rights Act of 1964 is codified at 42 U.S.C. § 2000e, *et seq*.

In his *Response in Opposition to Defendants' Motion for Summary Judgment*, Plaintiff states "there is the direct evidence that O'Leary professed openly to 'hate Mexicans' and that Rodriguez was Mexican." (ECF #23, p.10 [PageID #759]). In support of this, he cites the affidavits of Ms. Durbin and Mr. Sparks as evidence of direct discrimination and his own deposition testimony to support the unchallenged proposition that he is Mexican. He cites no other evidence of "direct" racial animus.

Mr. Rodriguez thus proceeds on the theory that the alleged "history" of Mayor O'Leary making racially insensitive remarks in the past about Hispanics or Mexicans, as described in the affidavits, could lead a trier of fact to conclude that the City, through Mayor O'Leary, acted upon that "history" of racial animus to terminate Mr. Rodriguez's employment. Neither of the affidavits satisfies the standard of "not requir[ing] any inferences to conclude that an adverse employment action was motivated at least in part by race," *McCormick*, 2022 U.S. App. LEXIS 30559, at *10, in that neither draw a direct line showing that the City terminated *Rodriguez's* employment based on his race, "lead[ing] ineluctably to the conclusion that the [employer] considered race" when taking an adverse employment action. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). This is so for a number of reasons.

First, each of the remarks attributed to Mayor O'Leary bear minimal, if any, connection to Mr. Rodriguez. "[T]he Sixth Circuit has repeatedly held that general statements that do not reference the plaintiff . . . cannot be considered direct evidence of discrimination." *McCormick*, 2022 U.S. App. LEXIS 30559, at *13-*14; *see also Foster v. Michigan*, 573 Fed. App'x 377, 393 (6th Cir. 2014) (determining that where statements do not specifically mention plaintiff, they are not direct evidence of discrimination) (citing *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir.

-26-

2012)).  Ms. Durbin's affidavit only mentions Mr. Rodriguez in a passing reference where she makes unsubstantiated (and the City states incorrect as well) allegations about the racial makeup of the City's workforce.  Mr. Sparks' affidavit makes no mention of Mr. Rodriguez at all.

Second, neither affidavit relates to employment (except for the aforementioned allegation about the composition of the City's workforce), let alone Mayor O'Leary's participation in Mr. Rodriguez's termination.  "Racially insensitive statements constitute direct evidence of discrimination 'only if they have some connection' to the adverse action alleged."  *Gray v. AutoZoners, LLC*, No. 22-1069, 2022 U.S. App. LEXIS 31584, at *8 (6th Cir. Nov. 15, 2022) (quoting *Griffin*, 689 F.3d at 595); *see also Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements by decision makers unrelated to the decisional process itself can not satisfy the plaintiff's burden of demonstrating animus.").  None of the allegations contained in the two affidavits are connected in any way to Mr. Rodriguez's termination, particularly since they describe statements allegedly made in 2014, and 2017 or 2018, respectively, well before Rodriguez was hired as Police Chief in 2021 or removed from that position in 2022.

Third, the statements identified in the affidavits occurred many years before the City's decision to terminate Rodriguez from his position as Police Chief, and are simply too remote in time to constitute *direct* evidence of discriminatory animus.[18]  The Sixth Circuit regularly rejects considering as direct evidence of discrimination statements that bear no temporal connection to an adverse employment action.  *See generally Hein v. All Am. Plywood Co., Inc.*, 232 F.3d 482, 489 (6th Cir. 2000) (finding that comments made five months before an employee's termination were

---

[18]    The Court will also evaluate this factor in connection as to whether these years-old statements support an *inference* of discriminatory intent in its discussion of the *McDonnell Douglas* factors set forth in the following portions of this *Memorandum of Opinion*.

too far removed to be direct evidence); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (stating that comments "nearly a year" before an adverse action "were made too long before . . . to have influenced the . . . decision"); *Bush*, 161 F.3d at 369 (discounting allegedly "ageist" comments made by plaintiff's supervisors that were "remote in time"). The Court finds that the affidavit statements are too removed in time from the employment action at issue to be direct evidence of discrimination toward Mr. Rodriguez.

And finally, the statements made in the affidavits are too vague or general to support finding them to be *direct* evidence of discriminatory intent. "Isolated and ambiguous comments are too abstract . . . to support a finding of [race] discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1988) (stated in the context of an age discrimination claim, though finding that an identified series of discriminatory comments related directly to the employment context, or a "discriminatory atmosphere" in the workplace, may "add 'color'" to an employer's decision making processes). Here, the "monkey scanners" comment (if that was in fact the comment versus "scanner monkeys") is not even remotely tied to Mr. Rodriguez or even Hispanics generally, and the claim that Mayor O'Leary "went on a racist tirade about Mexicans" at a meeting in 2014, or "over the years," at unknown times, "made multiple comments that evidenced a deep hatred of Blacks and Hispanics," without identifying any such comments, is not indicative of direct discrimination against Mr. Rodriguez.[19] The 2017 or 2018 alleged statement in Mr. Sparks' affidavit, of "I hate all Mexicans" is equally devoid of any context sufficient to be

---

[19] The only specific description of a comment was, "He said the problem was that the Mexicans move up here and then they bring their relatives up here, resulting in drug problems and increased crime," (ECF #18-14, p.1 [PageID #375]), does not appear even remotely, let alone directly, connected to the making of employment decisions.

-28-

taken as direct evidence of racial discrimination in connection with Mr. Rodriguez's termination four or five years later – especially so since the alleged comment was said to be preceded by Mayor O'Leary noting to Mr. Sparks that "he had a contract with Louie Cortez's company" to build the basketball courts at issue.

Thus, Mr. Rodriguez having produced no *direct* evidence that Mr. Rodriguez's termination was the result of discriminatory animus, the Court turns to whether he has presented sufficient inferential or circumstantial evidence of discriminatory intent to survive a motion for summary judgement under the *McDonnell Douglas* framework.

### (b)  Circumstantial Evidence Proof Under *McDonnell Douglas v. Green*

#### (i)  *Prima Facie Case*

The elements of a prima facie claim for race discrimination under Title VII are: "(1) membership in a protected class; (2) that [plaintiff] suffered an adverse action; (3) that [plaintiff] was qualified for the position; and (4) that [plaintiff] was replaced by, or treated differently than, someone outside the protected class." *Laderach v. U-Haul of Nw Ohio*, 207 F.3d 825, 828 (6th Cir. 2000).  There is no meaningful dispute that Mr. Rodriguez has stated a prima facie claim.[20]

#### (ii)  *Legitimate Nondiscriminatory Reason*

Thus, the Court proceeds directly to the question of whether the City met its burden to proffer evidence of a legitimate, non-discriminatory basis for Plaintiff's termination.  It has.  "This

---

[20]   The only statement made by Defendants with respect to this is, "[a]ssuming that Rodriguez could establish a prima facie case here," before setting forth its arguments on "legitimate nondiscriminatory reasons" for terminating Mr. Rodriguez's employment.  (ECF #21, p.13 [PageID #529]).

burden is one of production, not persuasion[.] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 142 (2000) (citation omitted). This burden requires the defendant to provide

"admissible evidence that 'if believed by the trier of fact, would support a finding that unlawful

discrimination was not the cause of the employment action.'" *Briggs v. Univ. of Cincinnati*, 11

F.4th 498, 508 (6th Cir. 2021) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir.

2006)). Put another way, "the employer need only introduce evidence which, taken as true, would

permit the conclusion that there was a non-discriminatory reason for the unfavorable employment

decision." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3rd Cir. 2006).

Needless to say, employers can fire employees for actual sexual harassment. *See Calling v.*

*Ohio Univ.*, 723 F. Supp. 3d 627, 639 (S.D. Ohio 2024) (finding allegations of sexual harassment

substantiated by an internal report sufficient to constitute a legitimate, non-discriminatory reason

for termination). Further, "[v]iolations of express company policies are legitimate, non-

discriminatory reasons for taking adverse employment actions." *Barker v. Pacer, Inc.*, No. 2:18-

CV-338, 2019 U.S. Dist. LEXIS, at *28-*29 (S.D. Ohio Aug. 27, 2019); *see also Blackhead v.*

*Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012). Moving to the direct context of

this case, courts universally recognize that "conduct unbecoming" – and specifically, the

harassment of coworkers – is a legitimate, non-discriminatory reason to terminate an employee.

*See Khamti v. Secy. of the Dep't of the Treasury*, 557 F. App'x 434, 440 (6th Cir. 2014) (finding

"conduct unbecoming of a management official" was a legitimate reason for termination); *see also*

*Ellerbee v. Chipotle Servs.*, LLC, No. 2:19-CV-5675, 2021 U.S. Dist. LEXIS 199734, at *3 (S.D.

Ohio Oct. 18, 2021) (finding incident when plaintiff's "hand touched" the "upper thigh" of a

subordinate coworker and texting same coworker off-duty was legitimate, non-discriminatory

reason for termination).

The City has clearly met its burden of production to show a legitimate non-discriminatory reason for Mr. Rodriguez's termination.

### (iii) Pretext

Because Defendant provided a legitimate, non-discriminatory reason for terminating Mr. Rodriguez, the burden shifts back to Plaintiff to proffer sufficient evidence of pretext to establish a triable issue.  That is, he must adduce sufficient evidence to prove by a preponderance of the evidence that the non-discriminatory reason advanced by the City is merely a pretext for race discrimination.  *See Gunn v. Seniors Servs. N. Ky.*, 632 F. App'x 839, 843 (6th Cir. 2015).  A plaintiff can show pretext by demonstrating that an employer's proffered reason:  (1) has no basis in fact; (2) did not actually motivate the employer's action; or (3) is insufficient to motivate the employer's action.  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

The Court begins with examining whether the City's justification has a basis in fact.  To evaluate the factual basis underlying the City's proffered reason, "[the Court] simply inquire[s] whether the proffered bases for [the] discharge actually happened," *Siefert v. Liberty Twp.*, No. 23-3692, 2024 U.S. App. LEXIS 22793, at *7 n.3 (6th Cir. Sept. 6, 2024) (quoting *Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 U.S. App. LEXIS 14469, at *[14] (6th Cir. June 8, 2023)).  Here, Mr. Rodriguez admits he engaged in the conduct that initially gave rise to the allegations of sexual harassment in Angela Scott's letter (later determined to constitute, at minimum, violations of the "Failure of Good Behavior" provisions of the City's *Personnel Policy Manual*).  (ECF #18, pp. 54, 63, 72 & 77 [Page ID #124, #133, #142 & #147]).  Thus, Plaintiff cannot demonstrate that the City's proffered reason lacked a basis in fact.

Next, the Court looks to whether the City's factual basis provided sufficient grounds to warrant removal. Typically, a plaintiff can show that his employer's rationale was insufficient to motivate discharge" by pointing to "evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Siefert*, 2024 U.S. App. LEXIS 22793, at *7 n.4 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S.. 167, 180 (2009)). Here, Plaintiff advances no such evidence. Instead, he argues his alleged bad behavior was insufficient to warrant removal after a "spotless 22-year Police career" and seeks to hold the City to the burden of establishing liability for a sexual harassment claim under Title VII instead of the standard required for termination for a violation of company policy sufficient to warrant a penalty of termination. (ECF #23, *Response in Opposition*, pp.11-12 [PageID #760-#761]).

Regarding his spotless prior career, evidence that he was a "reliable employee with a good employment record is not relevant, 'as it proves no more than that absent any misconduct on [his] part, [the City] was unlikely to terminate his employment.'" *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286 (6th Cir. 2012) (quoting *McConnell v. Swifty Transp., Inc.*, 198 F. App'x 438, 444 (6th Cir. 2006)) (inserts supplied).

With respect to termination, all the law requires is that an employer make a reasonably informed decision prior to making the termination decision. "An employer's pre-termination investigation need not be perfect." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (quoting *Seeger*, 681 F.3d at 285). Gathering witness statements and making a reasonable assessment of the available evidence as part of your investigation prior to terminating

an employee is sufficient process, "[t]he law does not require the [employer] to do anything more." *Loyd*, 766 F.3d at 592.  The City performed a good faith and sufficient investigation here. There is no genuine dispute that, upon being informed of a potential issue, the City turned over the investigation to its human resources consulting firm, Clemans Nelson, that Clemans Nelson conducted an over four-month investigation interviewing seven witnesses (including Mr. Rodriguez, who notes that he "voluntarily participated in the investigation," and was represented by counsel),[21] and that the investigation's findings were detailed in a written report prepared by Clemans Nelson and provided to the City.  The evidence shows that the City conducted a reasonable, informed, and considered decision prior to terminating Mr. Rodriguez.

Given the evident thoroughness of its investigation, the City is entitled to summary judgment on the "pretext" question.  It was acting on the honest belief that significant grounds existed warranting Mr. Rodriguez's removal as Police Chief for numerous violations of the "Failure of Good Conduct" provisions of the *City Personnel Policy Manual* which carried a penalty of termination for first violation.  Under what has come to be known as the "honest belief rule," "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Immormino v. Lake Hosp. Sys., Inc.*, 127 F. Supp. 3d 929, 837 (N.D. Ohio 2015) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009)).

Finally, Mr. Rodriguez argues that the sexual harassment allegations made against him by

---

[21]
    *See* ECF #23, *Response in Opposition*, p.4 [PageID #753] & ECF #18-5, *Pre-Disciplinary Conference Report.*, pp. 1 & 12 [PageID #290 & #301].

Ms. Scott (or the violations of the "Failure of Good Conduct Provisions" for which he was found guilty) did not actually motivate his termination because Mayor O'Leary's racial animus against him made his removal a "foregone conclusion." (ECF #23, p.12 [PageID #761]). Establishing "pretext" in this manner presents a more complicated proposition for Mr. Rodriguez. To do so, he must admit to both the factual basis underlying the employer's explanation (which he has), and also admit that such conduct *could* be grounds for dismissal, but that an illegal motivation of discrimination was *actually* the cause for dismissal. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S.. 167, 180 (2009). To do so here, Plaintiff points to the "contentious interactions" he described between himself and Mayor O'Leary.

To evaluate whether these statements and interactions can serve as circumstantial evidence of discrimination, the Court considers the following factors: (1) the identity of the speaker; (2) the nature and substance of the comments; and (3) the temporal proximity of the comments to the challenged decision. *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012).

The Court first looks to the oldest statements, those alleged in the affidavits (Ms. Durbin's 2014 report of an allegedly racist tirade and hiring "monkey scanners, and Mr. Sparks' recollection of alleged comment in 2017 or 2018 of "I hate all Mexicans"), and the 2014 claim that former Police Chief Sadderfield told Mr. Rodriguez that the Mayor had once made an unspecified racist joke. In addition to the fact that none of these alleged statements are even remotely connected to Mr. Rodriguez, the Court finds these comments to be too temporally remote in time from the date of Mr. Rodriguez's termination to be relevant circumstantial evidence. While evaluating temporal proximity is clearly an inexact science, examining prior court decisions

on the issue offers guidance on the matter.  For example, in *Pelcha v. MW Bancorp, Inc.*, 455 F.

Supp. 3d 481, 503 (S.D. Ohio), *aff'd*, 984 F.3d 1199 (6th Cir. 2021), the court found that

discriminatory remarks made just two months before an employee's termination were "sufficiently

close in time that a jury could make an inference of discrimination."  On the other hand, other

cases have indicated that a time period exceeding five months rendered the temporal proximity too

remote to establish causation.  Here, seven years elapsed between the alleged comments made in

2014, and four or five years elapsed between the alleged 2017 or 2018 statement of "I hate all

Mexicans," and Mr. Rodriguez's removal as Police Chief.  The many-years' distance between the

comments and Mr. Rodriguez's termination greatly compromises, if not essentially eliminates,

their probative value.

> The Court turns next to the statements that Mayor O'Leary allegedly made directly to Mr.

Rodriguez, "What, every monkey needs its own banana?" made in connection with ordering either

new patrol cars or police radios, and "You're going to piss me off man" made in connection with a

request for new patrol car decals, along with the generally "confrontational" attitude alleged to

have existed at the hotel opening.  These events occurred closer in time to Mr. Rodriguez's firing

– though still many months before – but the Court will take them as sufficiently "recent"  to not

discount their temporal proximity.  The next steps are to then to consider the identity of the

speaker and the nature and substance of the comments.

> Regarding identity of the speaker, the Court looks to whether the speaker was "in a

position to influence the alleged decision."  *Griffin*, 689 F.3d at 595 (quoting *Ercegovich v.

Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998)).  Looking to the *Griffin* case

itself, which involved the Mayor of Toledo, who held a similar management position as Mayor

O'Leary and who also ultimately signed off on the employment termination decision at issue, the court there found that the Mayor was a sufficiently relevant speaker.  This Court will do the same.

Turning now to the nature and substance of the comments, the Court will again draw comparison to *Griffin*.  There, the Mayor of Toledo allegedly made rather direct discriminatory statements, among them that blacks lack parenting skills, black men cannot hold jobs or take care of their families, black women just want to have babies and collect welfare, and that black ministers are pimps.  Another comment made by that mayor was "Thank God I was not raised poor and black," along with a host of other similar statements.  *Griffin*, 689 F.3d at 589.  While the only such comment made directly to the plaintiff there was calling him "lazy," the court found that the mayor's pointed comments unambiguously related to race and found that the alleged comments – especially a directly employment-related one about black employees lacking professionalism and drive – were salient evidence of a pervasive atmosphere of bias against black workers.  *Id.* at 596.  In *Griffin*, there was additional evidence of pretext in that the City's proffered reason for termination lacked a factual basis, and the City had at times given inconsistent reasons for his termination.  Here, the evidence does not even come close to that level of pervasiveness, and the only potentially "race-related" comment made to Mr. Rodriguez about "every monkey need[ing] its own banana" is ambiguous at best.

The remaining evidence offered as proof of pretext is Mr. Rodriguez's subjective beliefs created by what he describes as a series of "contentious interactions" unrelated to any racially connected statement, such as the interaction at the hotel opening, and the discussion over Mr. Rodriguez's preparation of a budget.  It is well-settled that "subjective beliefs . . . are wholly insufficient to establish a claim of discrimination as a matter of law."  *Smith v. City of Toledo*, 13

F.4th 508, 519 (6th Cir. 2021) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1002)).

Put simply, Mr. Rodriguez failed to provide sufficient evidence to show that a material issue of fact on "pretext" exists to challenge the City's proffered reason for his discharge.

Accordingly, the City is entitled to summary judgment on his claims.

### III.  CONCLUSION

Accordingly, for each of reasons set forth above, *Defendants' City of Galion and Thomas O'Leary's Joint Motion for Summary Judgment* (ECF #21) is GRANTED in its entirety.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
United States District Judge

DATED: _June 24, 2025_